UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

LARONDA PHILLIPS ON BEHALF OF E.P.               CIVIL ACTION

VERSUS                                           NO. 17-17047

NANCY A. BERRYHILL, ACTING                       SECTION "B" (2)
COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION

## REPORT AND RECOMMENDATION

Laronda Phillips, on behalf of her minor child, E.P., seeks judicial review pursuant to Section 405(g) of the Social Security Act (the "Act") of the final decision of the Commissioner of the Social Security Administration (the "Commissioner"), denying plaintiff's claim for childhood Supplemental Security Income ("SSI") benefits under Title XVI of the Act. 42 U.S.C. § 402 et seq. The matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) and Local Rule 73.2E(B).

Instead of filing a memorandum of facts and law as ordered, Record Doc. No. 13, plaintiff filed a motion for summary judgment. Record Doc. No. 14. The court treats her summary judgment motion as a memorandum of facts and law regarding her instant appeal from the Commissioner's final decision. The Commissioner filed a timely reply memorandum of facts and law. Record Doc. No. 22.

I.    PROCEDURAL HISTORY

E.P. was five years and three months old on March 9, 2015 when his mother applied for SSI on his behalf, alleging a disability onset date of December 10, 2010, due to a speech impairment and "mental conditions." (Tr. 59, 112, 129). However, "[c]laimants applying

to the SSI program may not receive payments for a period predating the month in which they apply for benefits." Rosetti v. Shalala, 12 F.3d 1216, 1224 n.20 (3d Cir. 1993) (citing 20 C.F.R. § 416.335); accord Brown v. Apfel, 192 F.3d 492, 495 n.1 (5th Cir. 1999); Wilson v. Colvin, No. 4:15-CV-711, 2017 WL 121056, at *1 n.2 (S.D. Tex. Jan. 11, 2017) (citing 20 C.F.R. § 416.335; Brown, 192 F.3d at 495 n.1).  "Thus, the month following an application . . . fixes the earliest date from which benefits can be paid." Hector v. Barnhart, 337 F. Supp. 2d 905, 910 (S.D. Tex. 2004) (citing 20 C.F.R. § 416.335; Brown, 192 F.3d at 495 n.1).  Phillips must show that E.P. was disabled as of March 9, 2015, when she filed for benefits on his behalf, through November 2, 2016, the date of the Administrative Law Judge's ("ALJ") decision.

After the application was denied, plaintiff filed a timely request for a hearing, which was conducted before an ALJ on August 11, 2016.  (Tr. 35-54).  The ALJ issued a decision on November 2, 2016, finding that E.P. was not disabled.  (Tr. 17-31).  After the Appeals Council denied plaintiff's request for review on October 5, 2017 (Tr. 1-6), the decision of the ALJ became the final decision of the Commissioner for purposes of this court's review.

II.   STATEMENT OF THE ISSUE ON APPEAL

Plaintiff contends that the Commissioner made the following error:

A.   Substantial evidence does not support the ALJ's finding that E.P. is not markedly limited in the functional domains of acquiring and using information, attending and completing tasks, and interacting and relating with others.

III.   ALJ'S FINDINGS RELEVANT TO ISSUE ON APPEAL

2

The ALJ made the following findings relevant to the issue on appeal:

A.    E.P. was a preschool child on his application date and a school-age child on the date of the ALJ's decision.

B.    He has severe impairments consisting of attention deficit hyperactivity disorder, anxiety disorder and mood disorder.

C.    His impairments do not meet or medically equal the criteria for any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, including Listing 112.11 for attention deficit hyperactivity disorder.[1]

D.    E.P. does not have an impairment or combination of impairments that functionally equals the severity of any listing.

E.    His medically determinable impairments could reasonably be expected to produce the alleged symptoms, but the statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical and other evidence in the record.

F.    E.P. has less than marked limitations in the functional domains of acquiring and using information, attending and completing tasks, and interacting and relating with others.  He has no limitation in the remaining three domains.

G.    He has not been disabled from March 9, 2015, the date his application was filed, through the date of the ALJ's decision.

(Tr. 48-49, 51, 53-58).

---

[1]The listings for mental disorders were recently revised, with an effective date of January 17, 2017.  Revised Medical Criteria for Evaluating Mental Disorders, 81 FR 66138-01, 2016 WL 5341732, at p. 1 (Sept. 26, 2016).  Because the ALJ in the instant case rendered her decision on November 2, 2016, the pre-revision version of Listing 112.11 applies.

IV.   ANALYSIS

A.   Standards of Review

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence.  Waters v. Barnhart, 276 F.3d 716, 716 (5th Cir. 2002); Loza v. Apfel, 219 F.3d 378, 389 (5th Cir. 2000); Spellman v. Shalala, 1 F.3d 357, 360 (5th Cir. 1993).  Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Loza, 219 F.3d at 393; Spellman, 1 F.3d at 360.  This court may not "reweigh the evidence in the record, try the issues de novo or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision."  Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000).  The Commissioner, rather than the courts, must resolve conflicts in the evidence.  Id.

The ALJ is entitled to make any finding that is supported by substantial evidence, regardless whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91 (1992).  Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence supports it.  Harper v. Barnhart, 176 F. App'x 562, 565 (5th Cir. 2006); Villa v.

Sullivan, 895 F.2d 1019, 1022 (5th Cir. 1990); Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive. Newton, 209 F.3d at 452; Martinez v. Chater, 64 F.3d 172, 173 (5th Cir. 1995).

To qualify for SSI, a claimant must be "disabled" as defined by the Act. 42 U.S.C. § 423(a)(1)(D). In 1996, Congress passed the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("1996 Act"), which redefined the eligibility standard for children under the SSI disability determination process. This statute applies to all child disability applicants who filed claims on or after August 22, 1996, or whose cases were not finally adjudicated before that date. Id. § 211(d)(1)(A)(I).

According to the 1996 Act, "[a]n individual under the age of 18 shall be considered disabled for the purposes of this title if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." Id. § 1382c(a)(3)(C)(i).

The Commissioner's final regulations in effect at the time of the ALJ's decision provide a three-step procedure for evaluating a child's claim of disability. The first step is to determine whether the claimant is engaging or has engaged in substantial gainful activity. If the answer is "yes," the claimant will be found not disabled. If the answer is "no," the second step requires a determination of whether the claimant has a medically

determinable severe impairment.  If not, the claimant will be found not disabled.  If the claimant has such an impairment, the last step is to determine whether the impairment meets or equals in severity, either medically or functionally, an impairment listed in Appendix 1, Subpart P, Part 404 of the Commissioner's regulations (the "Listings").  If the claimant has such an impairment and the impairment meets the duration requirement, the claimant will be found disabled.  If not, the claimant will be found not disabled.  20 C.F.R. § 416.924 (2014).

The claimant has the burden of proof at all steps of the inquiry.  Parks ex rel. D.P. v. Comm'r, Soc. Sec. Admin., 783 F.3d 847, 850 (11th Cir. 2015); Taylor ex rel. D.M.T. v. Colvin, 555 F. App'x 643, 643-44 (8th Cir. 2014) (citing Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004)); Lopez v. Barnhart, 176 F. App'x 618, 619 (5th Cir. 2006); Fox o/b/o HMB v. Berryhill, No. 16-16892, 2017 WL 7310104, at *2 (E.D. La. Dec. 12, 2017), report & recommendation adopted, 2018 WL 671231 (E.D. La. Jan. 31, 2018) (citing Fraga v. Bowen, 810 F.2d 1296, 1301 (5th Cir. 1987); 20 C.F.R. § 416.912(a)); Pickett v. Colvin, No. 3:15CV700, 2017 WL 439978, at *2 (S.D. Miss. Jan. 6, 2017), report & recommendation adopted, 2017 WL 422812 (S.D. Miss. Jan. 31, 2017) (citing Whitehead v. Colvin, 820 F.3d 776, 781 (5th Cir. 2016)).

The court "weigh[s] four elements of proof when determining whether there is substantial evidence of disability:  (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and

disability; and (4) his age, education, and work history." Martinez, 64 F.3d at 174; accord

Perez v. Barnhart, 415 F.3d 457, 462 (5th Cir. 2005).

B.    Factual Background

E.P. did not testify because he slept through the hearing.  His mother testified that

his condition has worsened since his previous hearing.[2]  Phillips stated that her son gets

upset when someone tells him something or picks on him, and he will pick up a knife and

run at the person.  Plaintiff said that E.P. has very bad temper tantrums.

Phillips testified that E.P. is treated by a therapist and a doctor at Metropolitan

Mental Health Services District.  She said that her son receives counseling and that the

doctor prescribes medicine once a month.  (Tr. 41).  Plaintiff stated that the doctor recently

discontinued clonidine[3] because E.P. was not getting enough sleep and that the doctor

prescribed Adderall[4] and melatonin[5] instead.  Phillips said that E.P. still sleeps only five to

---

[2]Phillips previously applied for SSI benefits for E.P. on April 12, 2013, apparently alleging the same onset date.  That application was denied on August 14, 2013.  (Tr. 57, 59, 135).

[3]Clonidine XR (extended-release) is a generic drug "used alone or in combination with other medications as part of a treatment program to control symptoms of attention deficit hyperactivity disorder . . . in children. . . .  Clonidine extended-release tablets may treat ADHD by affecting the part of the brain that controls attention and impulsivity." MedlinePlus (American Society of Health-System Pharmacists, Inc. 2018), http://www.medilexicon.com/drugs/kapvay.php (last visited Aug. 22, 2018).

[4]Adderall (generic name:    amphetamine  aspartate  monohydrate/amphetamine sulfate/dextroamphetamine saccharate/dextroamphetamine sulfate) is used for the treatment of attention-deficit hyperactivity disorder.  It may help increase attention and decrease impulsiveness and hyperactivity in people with that disorder. PDRhealth (PDR Network, LLC), http://www.pdr.net/pdr-consumer-monograph/adderall?drugla belid=1048&ConsumerId=1008 (last visited Aug. 22, 2018).

[5]"Melatonin helps regulate your sleep cycle.  It tells your body when it's time to go to sleep and when it's time to wake up.  Melatonin is sold over the counter . . . .  Most people take melatonin to help treat sleep disorders," such as insomnia. Familydoctor.org (American Academy of Family Physicians

six hours most nights and that he has mood swings during the day when he does not sleep enough.

Plaintiff stated that a counselor from Gwangi's Counseling Services visits E.P. at home twice a week. (Tr. 42). She testified that the counselor works with E.P. on avoiding depression, staying focused and paying attention, but the counselor also talks to E.P. outside of her presence and plaintiff does not know what else they do. Phillips stated that E.P. does not stay focused. She said she does not give her children chores, but she sometimes tells them to clean up after themselves or pick something up. Phillips stated that, if E.P. refuses more than once to do the task, she does it herself. She testified that the same thing happens with his homework and that she did his homework for him when he refused, and that E.P. then told school personnel that she had done so. (Tr. 43). Plaintiff stated that school personnel were angry with her for doing her son's homework, so she told them to have E.P. do the work at school, which they started doing. (Tr. 43-44). She said it took 45 minutes to an hour for E.P. to do homework because he refused to do it about one-half the time.

Phillips testified that E.P. had an Individualized Education Plan when he was at the Urban League early childhood program, but that she had just learned that the plan and accommodations for E.P.'s speech issues did not follow him when he went to Langston Hughes Academy, although it was supposed to do so. (Tr. 44). She said that E.P.'s speech

---

2018), https://familydoctor.org/melatonin/?adfree=true (last visited Aug. 22, 2018).

is understandable, but may not be understandable when he is mad and crying or hostile because he is upset. (Tr. 44-45). She stated that her son gets upset when people keep asking him the same thing.

Phillips testified that E.P. was six years old and in the first grade on the hearing date, and had not repeated a grade or attended summer school. She stated that school personnel had discussed having him attend summer school during the current summer, but he could not do so because he had missed too many days of school. Plaintiff stated that E.P. missed about three days of school per month because of doctor's appointments and that, if he was sick, she kept him at home and then took him to the doctor the next week. (Tr. 45).

Plaintiff said she thinks that E.P. gets along with his classmates, but said that the school calls about once a month to report that E.P. "got into it with somebody." (Tr. 45-46). Phillips believes that her son has no friends in his neighborhood or at school because he does not talk about any friends. She stated that E.P. has an eleven-year-old sister, with whom he does not get along, and that the two of them "fuss and fight. All day every day." She testified that both children instigate the fights. She said that E.P. thinks he will not get into trouble because he is the younger child and always thinks that his sister should be blamed. (Tr. 46).

Phillips stated that a social worker at Gwangi's Counseling gives her some parenting support information, such as telling her to contact Families Helping Families, and that she had a meeting scheduled with that organization the week after the hearing. She testified

that E.P.'s previous health care providers at Metropolitan referred her to the Children's Bureau, but she never followed up on that referral.

Plaintiff stated that, on a typical day, E.P. wakes up, takes his medicine, brushes his teeth and gets ready for school, and that she drops him off at school. She said he does not want to get up or get ready sometimes because it is too early for him, but he is all right after he is up for a while. Phillips testified that E.P. is very aggressive when he comes home from school and will not do anything she tells him to do. (Tr. 47). She stated that E.P. is supposed to go to bed at 8:30 p.m., but that she falls asleep before her children because she takes medication for depression, anxiety and bipolar disorder. She does not know whether E.P.'s father's family has a history of mental illness, but said that E.P.'s father had a history of violence. (Tr. 48).

Plaintiff testified that she does not think E.P. gets letter grades yet, but he gets written comments on his report card. She stated that his previous school was "ridiculous" and she had to take him out of it because he was not getting the help he needed. She said that E.P. had an Individualized Education Plan through his school and was mostly in regular classes. (Tr. 49-50). She stated that the only special education her son received was in speech therapy at the Urban League, but he did not receive it at Langston Hughes. (Tr. 50-51).

Phillips testified that E.P. started taking Adderall on March 29, 2016, and that he is calmer since he started it. (Tr. 51). She clarified that the school she did not like was Langston Hughes and that E.P. now attends KIPP East Community Primary School.

Plaintiff said that E.P. likes to play video games and watch television. She testified that she tells him not to open the door or go outside because she will look for him and find him three blocks away. She stated that E.P. does not listen to her and she is embarrassed to go places or do things with him. (Tr. 52-53). She said that he does not usually sleep during the day, as he did during the hearing. She did not know how long he slept the night before because she fell asleep before he did, but stated that her grandmother, with whom they were staying, told her that E.P. needs to start going to bed at night. (Tr. 53).

C.     Medical Evidence

I have reviewed the medical and school records in evidence and the ALJ's summary of the evidence. (Tr. 22-23). I find the ALJ's summary of the medical and school evidence substantially correct and incorporate it herein by reference, with the modifications, corrections and highlights noted below.

D.     Plaintiff's Appeal

Plaintiff's sole assignment of error is that substantial evidence does not support the ALJ's finding that E.P. has less than marked limitations in the functional domains of acquiring and using information, attending and completing tasks, and interacting and relating with others. At step three of the sequential evaluation, the ALJ found that E.P.'s

11

attention deficit disorder, anxiety disorder and mood disorder do not <u>meet or medically</u> <u>equal</u> any listed impairment because his signs, symptoms and history of treatment are inconsistent with listing-level severity.  As pertinent to plaintiff's appeal, the ALJ also found that E.P.'s severe impairment of attention deficit hyperactivity disorder does not <u>functionally equal</u> Listing 112.11 because he has less than marked limitations in the three domains of acquiring and using information, attending and completing tasks, and interacting with and relating to others.[6]

In her memorandum, Phillips vaguely contends that E.P.'s attention deficit hyperactivity disorder meets or medically equals Listing 112.11.  However, her primary argument appears to be that E.P.'s impairment functionally equals the listing.  Whether an impairment meets Listing 112.11 requires a different analysis than whether it functionally equals the listing.  Although plaintiff's only assignment of error appears to relate solely to functional equivalence, the court initially addresses her vague argument that the ALJ erred by finding that E.P. does not meet or medically equal the listing.

      1.    Substantial evidence supports the ALJ's finding that E.P.'s <u>impairment does not meet or medically equal Listing 112.11.</u>

To meet or medically equal Listing 112.11 for attention deficit hyperactivity disorder, as it was in effect on the date of the ALJ's decision, E.P. must have (A) medically documented findings of marked inattention, marked impulsiveness <u>and</u> marked

---

[6]Plaintiff does not contest the ALJ's findings that E.P. has no limitations in the other domains of moving about and manipulating objects, caring for himself, and health and physical well-being.

hyperactivity; and (B) at least two of the following: (1) marked impairment in age-appropriate cognitive/communicative function, documented by medical findings and including, if necessary, the results of appropriate standardized psychological tests, or for children under age 6, by appropriate tests of language and communication; (2) marked impairment in age-appropriate social functioning or (3) age-appropriate personal functioning, each documented by history and medical findings and including, if necessary, the results of appropriate standardized tests; or (4) marked difficulties in maintaining concentration, persistence or pace. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 112.11, 112.02(B)(2) (emphasis added).

"Marked" is defined by the Commissioner's regulations as

more than moderate but less than extreme. A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with the ability to function (based upon age-appropriate expectations) independently, appropriately, effectively, and on a sustained basis. When standardized tests are used as the measure of functional parameters, a valid score that is two standard deviations below the norm for the test will be considered a marked restriction.

Id. § 112.00(C) (emphasis added).

Whether an impairment or combination of impairments meets a listing is a medical question that can be answered only by medical evidence. 20 C.F.R. §§ 404.1526(b), 416.926(b); McCuller v. Barnhart, 72 F. App'x 155, 158 (5th Cir. 2003); Selders v. Sullivan, 914 F.2d 614, 619 (5th Cir. 1990); McKnight v. Astrue, No. 07-1654, 2008 WL 4387114, at *3 (W.D. La. Aug 15, 2008), report & recommendation adopted, 2008 WL

5746939 (W.D. La. Sept. 23, 2008), aff'd, 340 F. App'x 176 (5th Cir. 2009). "The specified medical criteria [of a listing] are designed to be demanding and stringent because they lead to a presumption of disability[,] making further inquiry unnecessary." Anderson v. Astrue, No. 3:11-CV-0051-K-BH, 2011 WL 3331821, at *6 (N.D. Tex. July 11, 2011), report & recommendation adopted, 2011 WL 3347857 (N.D. Tex. July 29, 2011) (citing Sullivan v. Zebley, 493 U.S. 521, 532 (1990); Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994)).

Thus, Phillips "must demonstrate that [E.P.'s] impairment meets all the specified medical criteria of the listing, rather than merely some of the criteria." McCaskill v. Dep't of Health & Human Servs., 640 F. App'x 331, 334 (5th Cir. 2016). "An impairment that manifests only some of the requisite criteria, no matter how severely, does not qualify. If the plaintiff fails to demonstrate the specified medical criteria, the court will find that substantial evidence supports the ALJ's finding that listings-level impairments are not present." Gewin v. Astrue, No. 10-1008, 2011 WL 3924232, at *3 (W.D. La. Aug. 3, 2011), report & recommendation adopted, 2011 WL 3954877 (W.D. La. Sept. 6, 2011) (citing Zebley, 493 U.S. at 530-31; Selders, 914 F.2d at 620); accord Taylor v. Astrue, No. 3-10-CV-1158-O-BD, 2011 WL 4091506, at *8 (N.D. Tex. June 27, 2011), report & recommendation adopted, 2011 WL 4091503 (N.D. Tex. Sept. 14, 2011), aff'd, 706 F.3d 600 (5th Cir. 2012).

14

Phillips has not carried her burden to show that E.P. meets or medically equals Listing 112.11. She "fails to explain how [E.P.'s] symptoms align with the criteria of the Appendix medical listing. She cites [evidence] about [E.P.'s] medical history,[7] but does not show how this medical evidence demonstrates that [E.P.] meets each of the required criteria under the Appendix medical listing." Heck v. Colvin, 674 F. App'x 411, 414-15 (5th Cir. 2017) (citing Zebley, 493 U.S. 521, 530 (1990); Perez, 415 F.3d at 461; Falco, 27 F.3d at 162) (quotations omitted).

First, as to E.P.'s speech, Phillips recites (without any explanation regarding their significance or citation to the record) three of her son's scores on a standardized test called BDI-2,[8] which was apparently administered during his pre-kindergarten program. Plaintiff states that E.P. had scores for "Receptive Communication abilities that were -1.00SD from the mean; Expressive Communication abilities that were -1.67SD from the mean; and Cognition that was -1.53SD from the mean." Record Doc. No. 14-1 at p. 5. "SD" apparently means standard deviation. Psychologist Charlotte Ducote, Ph.D., reviewed E.P.'s records on June 8, 2015 to determine at the agency level whether the boy has severe

---

[7]In violation of the court's briefing order, Record Doc. No. 13, Phillips fails to provide specific citations to the record evidence.

[8]The Battelle Developmental Inventory (BDI-2) "is an early childhood assessment that tests 5 global developmental domains and 13 subdomains, determining their strengths and needs in personal-social, adaptive, motor, communication, and cognitive skill sets. Test results can help determine a child's readiness for school and need for special education services." Battelle Developmental Inventory (Houghton Mifflin Harcourt 2018), https://www.hmhco.com/programs/battelle-developmental-inventory/overview (last visited Aug. 28, 2018).

impairments and their severity.  She stated in her summary that E.P.'s Individualized Education Plan dated March 27, 2013, when he was about three years and four months old, reflected that he had placed in the low average range on the BDI-2 for a child in his age group, but that he was expected to progress in the general education curriculum with speech therapy.  (Tr. 59).  My review of the administrative record has not located either the BDI-2 results or the March 27, 2013 Individualized Education Plan to which Dr. Ducote referred. The only Individualized Education Plan in the record is dated March 13, 2015, and it does not contain any BDI-2 results.  (Tr. 348-54).  However, even if the three test scores cited by plaintiff were still valid during the relevant time period of March 9, 2015 through November 2, 2016, when E.P. was at least two years older than when the BDI-2 was apparently administered, all of the scores were less than two standard deviations below the mean and therefore do <u>not</u> establish a marked limitation in age-appropriate cognitive/communicative function.  20 C.F.R. § 416.926a(e)(2)(iii).

In addition, the medical record indicates that E.P.'s speech difficulties did not cause a marked impairment in that function.  On August 12, 2013, when E.P. was three years and eight months old and during the pendency of his prior application for benefits, he was seen for a consultative examination by speech/language pathologist[9] Lesley G. Brown, M.C.D.,

---

[9]A qualified speech-language pathologist is an acceptable medical source for the determination of speech or language impairments.  20 C.F.R. § 404.1502(a)(5).

CCC-SLP.[10]  (Tr. 154-55).  Brown stated that E.P. had been in speech therapy since December 2010 and "can clearly express his wants and needs."  (Tr. 154).  Brown noted that all of the boy's objective test results were within normal limits, his connected speech was fully intelligible and his fluency was developmental without halting or interruption. She concluded that E.P.'s overall language was at a three year and four month level, his communication skills were within normal limits and speech-language therapy was not warranted, although his fluency skills should be monitored.  (Tr. 155).  On April 6, 2016, E.P.'s speech was noted to be normal.  (Tr. 282).

Second, mere diagnoses of and treatment for attention deficit hyperactivity disorder, anxiety disorder, mood disorder and speech/language delays do not establish disability.  20 C.F.R. § 416.925(d); Bordelon v. Astrue, 281 F. App'x 418, 422 (5th Cir. 2008) (citing Hames v. Heckler, 707 F.2d 162, 165 (5th Cir. 1983)); McLendon v. Barnhart, 184 F. App'x 430, 431 (5th Cir. 2006); Harris v. Barnhart, 65 F. App'x 129, 132 (9th Cir. 2003); Estok v. Apfel, 152 F.3d 636, 640 (7th Cir. 1998); Jones v. Sullivan, 954 F.2d 125, 128 (3d Cir. 1991).

Third, Phillips neither identifies evidence of medically documented findings of all three requirements of paragraph A of Listing 112.11, i.e., marked inattention, marked

---

[10]  M.C.D. is a master's degree in Communication Disorders.  Auburn Bulletin (Auburn 2018-2019),http://bulletin.auburn.edu/thegraduateschool/graduatedegreesoffered/communicationdisorders mcdms_major/ (last visited Aug. 27, 2018). CCC-SLP is a Certificate of Clinical Competence in Speech-Language Pathology.    American Speech-Language-Hearing Association, https://www.asha.org/certification/aboutcertificationgeninfo/ (last visited Aug. 27, 2018).

impulsiveness and marked hyperactivity, nor does she argue specifically or identify evidence that E.P.'s impairment satisfies at least two of the paragraph B requirements. Rather, plaintiff contends that E.P. has marked impairments in the functional domains of acquiring and using information, interacting and relating with others, and attending and completing tasks. This argument addresses functional equivalence rather than whether E.P. meets or medically equals the listing criteria. Nonetheless, the following evidence substantially supports the ALJ's finding that E.P. does not meet or medically equal either paragraph of Listing 112.11.

After reviewing E.P.'s medical and educational records, Dr. Ducote opined on June 8, 2015 that E.P. did not meet or medically equal the listing and did not functionally equal it because he had less than marked limitations in the domains of acquiring and using information, interacting and relating with others, and attending and completing tasks. These are the domains similar to the listing's paragraph B categories of age-appropriate cognitive/communicative function, social functioning, and ability to maintain concentration, persistence or pace, respectively. (Tr. 59-61). The ALJ appropriately accorded great weight to Dr. Ducote's opinions because, as the ALJ stated, they are within the psychologist's area of expertise and consistent with the medical record as a whole. "State agency medical and psychological consultants and other program physicians and psychologists are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation." 20 C.F.R. § 404.1527(f)(2)(i). "Although ALJs 'are

not bound by any findings made by State agency medical or psychological consultants,' they must consider such findings as opinion evidence." <u>Alejandro v. Barnhart</u>, 291 F. Supp. 2d 497, 515 (S.D. Tex. 2003) (quoting 20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2)(i)); <u>accord</u> <u>Stephens v. Barnhart</u>, 174 F. App'x 232, 233 (5th Cir. 2006) (citing <u>Carry v. Heckler</u>, 750 F.2d 479, 482 (5th Cir. 1985); 20 C.F.R. § 404.1527(f)(2)(i)); <u>Glass v. Barnhart</u>, 158 F. App'x 530, 532 (5th Cir. 2005); <u>Walker v. Halter</u>, 252 F.3d 434 (5th Cir. 2001).

The contemporaneous medical records, combined with Dr. Ducote's opinions, are substantial evidence that E.P. did <u>not</u> exhibit marked inattention, marked impulsiveness <u>and</u> marked hyperactivity during the relevant time period and thus did not satisfy paragraph A of Listing 112.11. The medical evidence reveals that E.P. was evaluated by a psychiatrist or clinical psychologist on eight occasions, during which he exhibited mild to moderate symptoms and showed improvement with treatment.

On August 25, 2011, when E.P. was 20 months old, he had a psychiatric evaluation at the State of Louisiana, Office of Mental Health, Early Childhood Supports and Services. His mother reported that he did not seem inattentive or overly active and was able to concentrate and focus when watching a DVD or when playing. (Tr. 168). Upon mental status evaluation, A. San Martin, M.D., and another psychiatrist whose signature appears to be C. Many, M.D., observed that E.P. was cooperative, made eye contact, engaged in organized and age-appropriate play by himself and with the observer, was not hyperactive

19

or intrusive, displayed no agitation or repudiation, and followed directions. (Tr. 172). The doctors concluded that the behaviors about which E.P.'s mother expressed concern were largely age-appropriate and did not warrant intervention, with the exception of the delay in the child's expressive language, for which further testing and speech therapy were needed. (Tr. 173). The psychiatrists diagnosed expressive language disorder and rule out parent-child relationship disorder. (Tr. 174).

At a follow-up visit on September 27, 2012, when E.P. was 33 months old, Dr. Many noted that he and his mother had completed Toddler Talk therapy with good results. The psychiatrist noted that E.P.'s behavior was generally within normal limits for his age, although he had some oppositionality, and that he had received therapy for his expressive speech delay until the previous June, when his case was closed because of family issues. Upon mental status evaluation, Dr. Many found that E.P.'s activity level, impulse control, ability to follow directions and parent-child reciprocity were age-appropriate. His affect was restricted and his speech was 50 percent comprehensible. Dr. Many opined that E.P. exhibited significant improvements in his speech and behavior, although he still had a speech delay. The physician recommended that the case be reopened, that Phillips and her son resume parent-child therapy and that E.P. resume speech therapy. (Tr. 178).

E.P.'s next psychologic evaluation was more than two years later on December 16, 2014, when he was seen by Kate Humphreys, Ph.D., at Metropolitan Mental Health Service District and Tulane Infant Mental Health Services. Upon mental status evaluation, the boy

displayed low activity, good eye contact and age-appropriate impulse control and ability to follow directions.  He was calm and cooperative, generally complied with commands, engaged in organized play and played within game rules.  His speech had improved to being 90 percent comprehensible.  Dr. Humphreys found no mood dysregulation, but assessed sleep disturbance, concentration difficulties and anxiety. (Tr. 228-32).  In a report dated January 7, 2015, Dr. Humphreys diagnosed speech development delays; disruptive behavior/oppositional defiant disorder; rule out attention deficit hyperactivity disorder; and rule out relationship/attachment disorder.  (Tr. 234).

On January 12, 2015, E.P., who was then 60 months old, was examined by a Dr. Gleason because of plaintiff's concerns about his aggression.  Dr. Gleason noted that E.P. had not been treated in more than a year.  Phillips reported that her son was "mostly mellow" and "good and calm almost all the time," but got angry when things did not go his way.  She said he "acted up" and had temper tantrums at home, although he had no behavior problems at school or when his aunt took care of him.  (Tr. 224).  Dr. Gleason observed that E.P. was <u>not</u> hyperactive, distractible or provocative and that he was cooperative.  Although he was mildly hypervigilant, he had good eye contact, sat quietly, was highly focused, tracked the conversation and easily followed all directions from the doctor and most directions from his mother.  (Tr. 225).  Dr. Gleason diagnosed separation anxiety disorder, adjustment disorder with disturbance of emotions and conduct (chronic), rule out mood disorder and rule out post-traumatic stress disorder.  The physician

recommended parent-child therapy to target the parent-child relationship and increase positive interactions. Like E.P.'s other treating physicians, Dr. Gleason did not believe that treatment with medication was indicated, other than melatonin to aid sleep. (Tr. 226).

Psychiatrist Danielle Ibelema, M.D., at Metropolitan Health Services assessed six-year-old E.P. on February 2, 2016. Phillips reported a recent incident when E.P. had threatened an adult with a knife. Plaintiff stated that E.P. was oppositional at school, had difficulty with anger, threw temper tantrums daily and hit family members when he did not get his way. He saw a counselor twice a week. He reportedly was in kindergarten at Langston Hughes Elementary and received good grades with no accommodations, but had behavior difficulty. (Tr. 371). E.P.'s mental status examination was good and/or within normal limits in all respects, including no hyperactivity, except that he was indifferent, uncooperative, evasive and suspicious and had fair eye contact, concentration, memory and intellect; a blunted affect; and poor insight and judgment. (Tr. 372-73). Dr. Ibelema diagnosed parent-child relational problem and oppositional defiant disorder. She planned to admit E.P. to medication management and advised him to continue his counseling therapy. (Tr. 374-75).

On March 29, 2016, Dr. Ibelema saw E.P. with the same diagnoses. His mental status evaluation was again within normal limits, except for fair eye contact and concentration and limited insight and judgment. The psychiatrist prescribed clonidine and continued E.P.'s counseling. (Tr. 366-69).

Ashley Weiss, M.D., became E.P.'s psychiatrist on June 29, 2016. Phillips reported that clonidine was helping E.P. to be calmer, but that she had a lot of trouble giving the medication, as a result of which Dr. Weiss expressed doubt that E.P. was taking the drug regularly. Dr. Weiss noted that E.P.'s hyperactivity was his treatment priority because it caused the most significant problems. She discontinued clonidine and started Adderall XR (extended release) because daily compliance was not as important with a stimulant. E.P. was very cheerful and upbeat and his mental status examination was good and/or within normal limits, except that he was hyperactive, had limited concentration and showed fair insight and judgment. Dr. Weiss diagnosed attention deficit hyperactivity disorder, combined presentation; rule out obsessive compulsive disorder; and rule out disruptive mood dysregulation disorder. (Tr. 361-64).

E.P.'s final psychological assessment in the record was by Dr. Weiss on July 26, 2016, before he entered first grade. Phillips reported that Adderall XR lasted four to five hours and made E.P. calmer, more directable and more focused. She stated that, when the drug wore off, E.P. was hyperactive, needed a lot of redirection and was very talkative and loud. He slept well, but sometimes needed melatonin. Dr. Weiss noted that E.P. had a "history of inconsistent parenting," worries a lot and has a lot of separation anxiety about his mother. He saw a counselor twice a week, who felt that he was often depressed. Dr. Weiss opined that E.P. needs further evaluation for depression and/or anxiety issues. She concluded that Adderall XR was helping with the boy's behavior and attention deficit

hyperactivity disorder symptoms, and she increased his dosage.  (Tr. 356-57).  E.P.'s mental status examination was good and/or within normal limits, except that he was hyperactive, had limited concentration and had fair insight and judgment.  Dr. Weiss diagnosed attention deficit hyperactivity disorder, combined presentation; parent-child relational problem; and oppositional defiant disorder.  (Tr. 357-59).

The medical evidence thus substantially supports a finding that E.P.'s impairment does not meet the listing's paragraph A criteria of marked inattention, marked impulsiveness <u>and</u> marked hyperactivity.  He cannot meet the listing without satisfying those requirements, without even addressing the paragraph B criteria.  However, the same evidence substantially supports a finding that he does not meet the paragraph B requirements of at least two of the following:  marked impairments in social functioning, age-appropriate cognitive/communicative function or personal functioning, or marked difficulties in maintaining concentration, persistence or pace.

Accordingly, to whatever extent Phillips argues that the ALJ erred by finding that E.P.'s attention deficit hyperactivity disorder does not meet or medically equal Listing 112.11, this assignment of error lacks merit.

> 2.    Substantial evidence supports the ALJ's finding that E.P.'s <u>impairments do not functionally equal Listing 112.11.</u>

After finding that E.P. does not meet or medically equal Listing 112.11, the ALJ held that E.P. does not functionally equal the listing because he has less than marked limitations in the functional domains of acquiring and using information, attending and

completing tasks, and interacting and relating with others.  Phillips contends that E.P. has marked limitations in these three domains.  If supported by substantial evidence, marked limitations in two domains would establish functional equivalence with Listing 112.11. Plaintiff makes no specific arguments regarding how the evidence establishes marked limitations in any of these domains.

An ALJ must assess functional equivalence in children by examining the child's limitations in six domains:  "(i) Acquiring and using information; (ii) Attending and completing tasks; (iii) Interacting and relating with others; (iv) Moving about and manipulating objects; (v) Caring for yourself; and, (vi) Health and physical well-being." 20 C.F.R. § 416.926a(b)(1).  An impairment or combination of impairments functionally equals a listed impairment if it results in marked limitations in two domains or an extreme limitation in one.  Id. § 416.926a(a).  The definition of "marked" is, as stated above, "more than moderate but less than extreme," and/or demonstrated by a valid standardized test score that is two standard deviations below the norm.  Id. § 416.926a(e)(2)(i), (iii).  There is no record evidence of any valid standardized test scores that are two standard deviations below the norm.

The relevant evidence as a whole substantially supports the ALJ's findings that E.P. does not have marked limitations in at least two of the domains of acquiring and using information, attending and completing tasks, and interacting and relating with others.  The ALJ gave great weight to Dr. Ducote's opinions, which are supported by E.P.'s medical

records that, as discussed above, do not support any marked functional limitations. The ALJ also relied on E.P.'s school records and notes from his treating mental health counselors at Gwangi's Counseling Research Training and Social Service Institute, LLC.

The licensed professional counselors at Gwangi's Counseling are not "acceptable medical sources" for purposes of establishing a medically determinable impairment. "Acceptable medical sources" include licensed physicians and certain other listed medical practitioners, while "other sources" are the remaining sources not listed in the regulations. "Only 'acceptable medical sources' can establish the existence of a medically determinable impairment, give medical opinions, and be considered treating sources whose medical opinions may be entitled to controlling weight. 'Other sources' can be used to support findings of severity of an impairment and effect on ability to work." Young v. Berryhill, 689 F. App'x 819, 821-22 (5th Cir. 2017) (citing Thibodeaux v. Astrue, 324 F. App'x 440, 445 (5th Cir. 2009); Porter v. Barnhart, 200 F. App'x 317, 319 (5th Cir. 2006); 20 C.F.R. §§ 416.913(a)(1)-(5), 416.913(d), 416.927(a)(2)) (quotations omitted); accord Kenny v. Colvin, No. A-15-CV-509-AWA, 2016 WL 1369592, at *3 (W.D. Tex. Apr. 6, 2016) (citing Raney v. Barnhart, 396 F.3d 1007, 1010 (8th Cir. 2005); 20 C.F.R. §§ 404.1513(a), 416.913(a)); Hunt v. Astrue, No. 4:12-CV-244-Y, 2013 WL 2392880, at *11 n.14 (N.D. Tex. June 3, 2013) (citing Zumwalt v. Astrue, 220 F. App'x 770, 780 (10th Cir. Mar. 22, 2007)) (additional citations omitted); Hoelck v. Barnhart, No. A-06-CA-526, 2007 WL 496850, at *2 (W.D. Tex. Feb. 6, 2007), aff'd, 261 F. App'x 683 (5th Cir. 2008). The ALJ

in this case gave "some weight" to the counselors as "other sources" to determine the severity of E.P.'s impairments and functioning because, as the ALJ stated, the counselors' progress notes demonstrate that E.P. made improvements in behavior and are consistent with the record as whole to the extent they do <u>not</u> establish that he is disabled. (Tr. 24).

The records from E.P.'s psychiatrists discussed above and the notes of his mental health counselors during the relevant time period show that E.P. improved with treatment. Notes of parent-child counseling at Metropolitan Health Services from February 22, 2015 through April 8, 2015 reflect that E.P. was cooperative and that the played gently and with concentration during the sessions. The parent-child therapy was discontinued because of excessive cancellations and no-shows. (Tr. 240-43).

E.P. had twice-weekly counseling sessions with Gwangi's Counseling starting on August 6, 2015 through August 4, 2016. The progress notes often reflect that E.P. had good eye contact and participation with minimal hyperactivity. When he was hyperactive, he was usually easily redirected and he calmed down soon after the sessions began. The counselors noted several times that the sessions went well overall and that E.P. displayed mild to moderate progress and improvement in his self-control, anger and behavior. (Tr. 246-80, 289-347). A medical condition that can reasonably be remedied by surgery, treatment or medication is not disabling. <u>Muckelroy v. Astrue</u>, 277 F. App'x 510, 511-12 (5th Cir. 2008) (citing <u>Burnside ex rel. Burnside v. Bowen</u>, 845 F.2d 587, 592 (5th Cir. 1988), <u>abrogated on other grounds by</u> <u>Sullivan v. Zebley</u>, 493 U.S. 521, 527 (1990));

Hebert v. Barnhart, 197 F. App'x 320, 323 (5th Cir. 2006) (citing Johnson v. Bowen, 864 F.2d 340, 348 (5th Cir. 1988)); Leblanc v. Chater, 83 F.3d 419, 1996 WL 197501, at *3 (5th Cir. 1996); Lovelace v. Bowen, 813 F.2d 55, 59 (5th Cir. 1987).

E.P.'s school records include a Caregiver-Teacher Report Form containing a long list of possible behavioral and psychological problems that was completed by Germaine Collins, E.P.'s teacher at his Head Start early childhood program on September 27, 2012. The report's conclusion was that E.P.'s behaviors were within normal limits for boys of his age and that his teacher's primary concern was with his speech. (Tr. 195-200).

According to his Individualized Education Plan dated March 13, 2015, E.P. was friendly and very talkative, got along with adults and peers, and was not in special education classes. (Tr. 349, 353). The plan noted that his difficulties with speech fluency had decreased, his behavior difficulties had "diminished greatly" and his behavior was "improving daily." (Tr. 348, 350). E.P. did not need or receive any accommodations, other than speech therapy once a week to address mild delays in articulation. (Tr. 350, 352, 354). His kindergarten report card for 2015-2016 showed that he met or exceeded expectations in every class, except that he received no grades in a few subjects in his last trimester because of excessive absences. (Tr. 152). On January 5, 2016, a licensed social worker noted that E.P.'s reported strengths included good verbal skills and that he had average school performance with "somewhat" of a problem with reading and writing and relationship with peers. (Tr. 380, 384).

As to the medical opinion evidence, the ALJ gave great weight to the opinions of Dr. Ducote, who reviewed E.P.'s records on June 8, 2015. Dr. Ducote opined that E.P. had less than marked limitations in the three domains of acquiring and using information, attending and completing tasks, and interacting with and relating to others. (Tr. 60-61). It is well established that the ALJ may rely on the non-examining expert's function-by-function analysis of the impact of claimant's impairments on his ability to perform various tasks. Beck v. Barnhart, 205 F. App'x 207, 213-14 (5th Cir. 2006) (citing Onishea v. Barnhart, 116 F. App'x 1, 2 (5th Cir. 2004); Myers v. Apfel, 238 F.3d 617, 620-21 (5th Cir. 2001); SSR 96-8p, 1996 WL 374184); accord Weatherspoon v. Astrue, No. 12-2998, 2013 WL 5507293, at *5 (E.D. La. Sept. 30, 2013) (citing Onishea, 116 F. App'x at 2). No medical evidence contradicts Dr. Ducote's assessment. Indeed, as previously discussed, the medical evidence substantially supports the ALJ's findings that E.P. has less than marked impairments in all of his functional areas.

The medical and school records summarized above generally reflect mild to moderate symptoms of attention deficit disorder, with improvements in E.P.'s condition with counseling and medication. Although there are indications of setbacks at times, it is the ALJ's province to weigh the evidence and resolve any conflicts. Newton, 209 F.3d at 452; Escalante v. Astrue, 286 F. App'x 179, 180 (5th Cir. 2008) (citing Griego v. Sullivan, 940 F.2d 942, 945 (5th Cir. 1991); Moore v. Sullivan, 919 F.2d 901, 905 (5th Cir. 1990)).

Substantial evidence therefore supports the ALJ's findings that E.P. has less than marked limitations in the domains of acquiring and using information, attending and completing tasks, and interacting and relating with others. Because he does not have marked limitations in at least two domains, he does not functionally equal Listing 112.11. Accordingly, this assignment of error lacks merit.

## **RECOMMENDATION**

For the foregoing reasons, **IT IS RECOMMENDED** that plaintiff's appeal be denied and her complaint be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[11]

New Orleans, Louisiana, this _____3rd_____ day of October, 2018.

_____
JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[11]Douglass referred to the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.